**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ───────────────────────────── )<br>MEMPHIS PUBLISHING )<br>COMPANY, *et al.*, )<br> )<br>    Plaintiffs, )<br> )<br>  v. )<br> )<br>FEDERAL BUREAU OF )<br>INVESTIGATION, )<br> )<br>    Defendant. )<br>───────────────────────────── ) | Civil Action No. 10-1878 (ABJ) |

<u>**MEMORANDUM OPINION**</u>

   This case involves Freedom of Information Act requests made by plaintiff Marc Perrusquia, a reporter for the newspaper *The Commercial Appeal,* owned by plaintiff Memphis Publishing Company, for all Federal Bureau of Investigation ("FBI") records concerning Ernest Withers, a noted photographer of the civil rights movement. Withers is now deceased, but his lens memorialized many of the defining moments of the 1960s. Plaintiffs allege that while Withers was enjoying unique access to Dr. Martin Luther King, Jr., and other civil rights leaders, he was simultaneously serving as a conduit of confidential information to the FBI. Pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (2010), plaintiffs have requested, and they allege that the FBI has improperly withheld, what plaintiffs refer to as the "Withers informant file." The FBI maintains that it has neither confirmed nor denied the existence of such a file, and that its FOIA production is complete. *See, e.g.*, Argall Decl. ¶ 38. Currently before the Court are plaintiffs' motion to compel the production of a Vaughn Index [Dkt. # 18] and the parties' cross motions for summary judgment [Dkt. # 9 and # 14].

The issue before the Court is not whether an informant file on Withers exists or whether the FBI must produce its contents.  Rather, the question the Court has undertaken to resolve first is whether the statutory exclusion for informant records contained in 5 U.S.C. § 552(c)(2) would apply if there were a file, and whether the FBI would be bound to acknowledge the existence of the file and comply with the FOIA mandate to either produce it or justify any withholding of its contents under specific exemptions.  For the reasons stated below, the Court finds that if the FBI has relied on section 552(c)(2) to exclude any documents from FOIA processing, it may no longer do so, because Withers' status as an informant has been officially confirmed.  Accordingly, the Court will grant plaintiffs' motion to compel the production of the Vaughn Index and deny the cross motions for summary judgment without prejudice to the filing of updated dispositive motions at a later point in this litigation.  The motion to compel the FBI to produce the materials for *in camera* review is similarly denied without prejudice.

## I.  BACKGROUND

### A.  Factual Background

Ernest Withers was a photographer who chronicled the civil rights movement in the 1960s.  His famous photographs include an image of Dr. King riding one of the first desegregated buses in Montgomery, Alabama, and a picture of black sanitation workers carrying signs declaring "I Am a Man" at a protest in Memphis.  *See* Ex. A to Pls.' Mot. Summ. J.  The complaint alleges that Withers used his camera to create what have become iconic images of the struggle for equality, and that as he bore witness to historic public events, he also came to be welcome at behind-the-scenes gatherings, gaining unprecedented access to the leaders of the civil rights movement and their plans.  Compl. ¶¶ 2–3.  He died on October 15, 2007, at the age of eighty-five.  Perrusquia Decl. ¶ 3.

In 2008, *The Commercial Appeal*, a Memphis-based daily newspaper, began investigating Withers and his rumored role as a FBI informant.  Perrusquia Decl. ¶ 2.  The reporter decided to pursue the story after Withers' death, believing that "once the subject of FBI records dies, the government will more readily release information about them to the public."  *Id.* ¶ 3.  The paper's interest in Withers grew out of a larger inquiry into the history of the FBI's surveillance of the civil rights movement forty years ago.  Compl. ¶ 3.  Plaintiffs submit that "[t]he country continues to examine whether the government's surveillance of civil rights leaders reflected a genuine concern for public safety or, instead, an effort to harass citizens and squelch protest."  Compl. ¶ 5; *see also* Pls.' St. of Mat. Fact ("SMF") ¶ 2.  They state that they sought all documents related to Withers because the materials would "further the public's understanding of this unresolved issue" as well as "inform the ongoing debate about whether the government has gone too far in current domestic surveillance operations."  Compl. ¶ 5.

Perrusquia filed a FOIA request with FBI headquarters on February 12, 2008, requesting all documents related to "Third party – Ernest Withers."  Argall Decl. ¶ 5; Ex. A to Def.'s Cross Mot. Summ. J.  The request alleged that Mr. Withers "doubled as an FBI informant."  Argall Decl. ¶ 5.  On July 31, 2008, the FBI responded that it had no responsive records at the headquarters, and it advised Perrusquia that he should submit a separate FOIA request to the field office where he believed responsive records would be maintained.  Argall Decl. ¶ 8; Ex. D to Def.'s Cross Mot. Summ. J.

On September 2, 2008, Perrusquia submitted a second FOIA request to the FBI's Memphis Field Office for "all FBI documents involving Mr. Withers."  Argall Decl. ¶ 9; Ex. E to Def.'s Cross Mot. Summ. J.  Perrusquia noted in this request that Withers had died on October 15, 2007.  Argall Decl. ¶ 9.  The FBI responded on March 12, 2009, and released 115 pages of

records with certain information exempted pursuant to Exemptions 2, 6, 7(C), and 7(D).  Argall Decl. ¶ 12; Ex. H to Def.'s Cross Mot. Summ. J.[1]  Four documents were withheld in their entirety and two pages were withheld as duplicates.  Argall Decl. ¶ 12.

Perrusquia submitted an appeal to the Office of Information Policy ("OIP") at the Department of Justice on May 5, 2009.  Argall Decl. ¶ 13; Ex. I to Def.'s Cross Mot. Summ. J. On May 22, the appeal was amended "to make it clear" that it included a request for the confidential informant ("CI") file the reporter understood to be in the FBI's possession.  Ex. J to Def.'s Cross Mot. Summ. J.  Citing documents that the FBI had already produced, Perrusquia asked for "a copy of Mr. Withers' 170 file connected to his status as a CI," and he stated that Withers "was a CI formerly designated as ME 338-R."  Argall Decl. ¶ 14 (internal quotation marks omitted); Ex. J to Def.'s Cross Mot. Summ. J.  The appeal was amended for a second time on July 7, 2009, to include any photographs in FBI files taken by Mr. Withers.  Argall Decl. ¶ 16; Ex. L to Def.'s Cross Mot. Summ. J.

OIP informed Perrusquia on July 14, 2009, that the FBI had agreed to conduct a further search for responsive records at its headquarters and field offices, and any additional responsive records that were located would be provided to plaintiffs.  Argall Decl. ¶ 17; Ex. M to Def.'s Cross Mot. Summ. J.  On March 8, 2010, the FBI released additional records concerning Mr. Withers.  Argall Decl. ¶ 22.  Perrusquia was advised that 369 pages of records had been reviewed and 254 pages of records were being released with certain information exempted pursuant to Exemptions 2, 3, 6, 7(C), 7(D), and 7(E).  *Id.*; Ex. R to Def.'s Cross Mot. Summ. J.  The FBI

---

1    The FBI's responses to the FOIA requests were on official FBI letterhead and signed by David M. Hardy, Section Chief, Record/Information Dissemination Section, Records Management Division.  Ex. D and Ex. H to Def.'s Cross Mot. Summ. J.

withheld five pages in their entirety pursuant to Exemption 7(E) and withheld the remaining 110 pages as duplicates. Argall Decl. ¶ 22.

Perrusquia appealed the March 8, 2010 release of documents to OIP on April 21, 2010, on three grounds: (1) improper withholding of material; (2) inadequate search for records; and (3) failure to grant a fee waiver. *Id.* ¶ 24; Ex. T to Def.'s Cross Mot. Summ. J. On August 31, 2010, OIP affirmed the FBI's response, finding that the FBI properly withheld information pursuant to the claimed FOIA exemptions. Argall Decl. ¶ 26; Ex. V to Def.'s Cross Mot. Summ. J. OIP also determined that the FBI's search was adequate and reasonable and that plaintiffs' request for a fee waiver was moot because he was only assessed duplication fees. Argall Decl. ¶ 26.

On June 8, 2011, the FBI released additional "non-exempt, cross-reference" documents responsive to the FOIA requests. *Id.* ¶ 28; Ex. W to Def.'s Cross Mot. Summ. J. The FBI indicated that it had reviewed 391 pages of records and twelve audio tapes and was releasing 373 pages of records and three audiotapes to plaintiffs with certain information withheld pursuant to the relevant FOIA exemptions. Argall Decl. ¶ 28. The FBI withheld four pages in their entirety pursuant to Exemptions 6, 7(C), and 7(D) and withheld fifteen pages as duplicates. *Id.*

### B. Procedural Posture of the Case

Plaintiffs brought this action in federal court on November 3, 2010. [Dkt. # 1]. The complaint alleged that the Withers informant file was specifically requested, Compl. ¶¶ 3, 20; that it is subject to public disclosure under FOIA, *id.* ¶ 4; and that the FBI has not even acknowledged the existence of the file, *id.* ¶ 23. Plaintiff moved for summary judgment on January 26, 2011, arguing, in part, that the agency's failure to produce records detailing the informant relationship demonstrated either that the FBI's search was inadequate or that the

agency was improperly withholding records without specifying the particular exemption that would justify such an action.  Pls.' Mem. in Supp. of Mot. Summ. J. at 11 [Dkt. # 9].  Plaintiffs also challenged the exemptions upon which other records, which were identified, had been withheld.  *Id*. at 14.  Defendant opposed the motion and filed its own cross motion for summary judgment.  Def.'s Cross Mot. Summ. J. [Dkt. # 14].  It briefed the question of whether the records it acknowledged withholding were exempt, but went on to assert that even if the alleged Withers informant file existed, it was not subject to the requirements of FOIA at all, but was excluded from the statutory regime by 5 U.S.C. § 552 (c)(2).  *Id*. at 38–44.

At that point, plaintiffs moved to compel the FBI:  (1) to produce a Vaughn index specifying what if anything was being withheld pursuant to the (c)(2) exclusion; and (2) to produce the Withers informant file to the Court for *in camera* review.  Pls.' Mot. to Compel [Dkt. # 18].  Plaintiffs further requested that the resolution of any other issues raised in the motions for summary judgment be stayed pending resolution of the section 552(c)(2) issue.  Pls.' Mot. to Stay [Dkt. # 17].  The FBI moved to strike the motion to compel.  Def.'s Mot. to Strike [Dkt. # 19].  After a hearing on August 3, 2011, the Court ordered that a hearing would be held on the exclusion issue raised in both defendant's motion for summary judgment and plaintiffs' motion to compel, and it indicated that the dates for any further briefing on the cross motions for summary judgment would be established in connection with the ruling on the motion to compel. Minute Order, Aug. 3, 2011.  On October 4, 2011, the Court heard argument on the applicability of section 552(c)(2) to plaintiffs' FOIA request.

### C.  Documents Allegedly Confirming Withers' CI Status

The FBI takes the position in this case that plaintiffs' suspicions about Withers remain unconfirmed.  According to the FBI, none of the three releases of FOIA material to the plaintiffs

"contained an alleged confidential informant file pertaining to Ernest Withers or documents allegedly contained therein, nor has the FBI officially confirmed allegations that Withers served as an informant for the FBI."   Argall Decl. ¶ 38.   But plaintiffs maintain that the materials released to the public on March 12, 2009 and March 8, 2010 included two documents that "clearly show that Withers was an informant for the FBI."   Pls.' Mem. in Supp. of Mot. Summ. J. at 16.

The documents in question were provided to plaintiffs as part of the FBI's FOIA production.   The first document reads:   "Ernest Columbus Withers was formerly designated as ME 338-R [redacted text] captioned 'Ernest Columbus Withers; CI.'"   Ex. B to Pls.' Mot. to Compel.   The second document is a search slip for documents concerning Withers dated from 1978 that includes a handwritten notation:   "Conf. Info."   Ex. D to Pls.' Mot. to Compel.   Other material was redacted from the two pages.[2]

The same documents were publicly released again on June 15, 2011, when the defendant attached them as exhibits to its publicly filed Motion for Summary Judgment [Dkt. # 14].   The exhibits differed slightly from the original documents included in the FOIA production in that they had been assigned Bates numbers.   They also now bore a notation from the FBI justifying the redactions, citing Exemption 7(D), the category that protects information that could "reasonably be expected to disclose the identity of a confidential source."   5 U.S.C. § 552(b)(7)(D); Ex. X to Argall Decl.  [Dkt. # 14-5].

The FBI explains:

To the extent plaintiff Perrusquia claims that the FBI's release of Withers' public corruption files disclosed information from which he could deduce Withers' alleged status as a confidential informant, any such disclosure would have been inadvertent.

---

2       These documents are attached to the Court's opinion as Ex. 1 and Ex. 2.

> Except in circumstances not applicable here, the FBI does not confirm or deny an individual's status as a confidential informant and protects from disclosure information that could identify confidential informants as such.

Argall Decl. ¶ 38.

## II. ANALYSIS

Whether the FBI is required to produce a Vaughn Index turns on the predicate question of whether the documents plaintiffs have requested are subject to the requirements of the FOIA statute. This requires the Court to determine whether, as a matter of law, the FBI may treat the requested informant records as outside the scope of the Act under the provisions of section 552(c).

### A. FOIA Background

FOIA requires the release of government records upon request, and its purpose "is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). FOIA includes nine exemptions under which the government may refuse to disclose responsive records for specified reasons. "Given the FOIA's broad disclosure policy, the United States Supreme Court has 'consistently stated that FOIA exemptions are to be narrowly construed.'" *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007), quoting *DOJ v. Julian*, 386 U.S. 1, 8 (1988); *see also FBI v. Abramson*, 456 U.S. 615, 621 (1982).

In a narrow set of cases, the FOIA exemptions "cover not only the content of the protected government records but also the fact of their existence or nonexistence, if that fact itself properly falls within the exemption." *Larson v. Dep't of State*, 565 F.3d 857, 861 (D.C. Cir. 2001). In those circumstances, an agency may respond to a FOIA request by refusing to

confirm or deny the existence of responsive records when "to answer the FOIA inquiry would cause harm cognizable under an . . . exception." *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982); *see also Larson*, 565 F.3d at 861.  This is commonly known as a "Glomar response."  *See Phillippi v. CIA*, 546 F.2d 1009 (D.C. Cir. 1976) (explaining origin of the term "Glomar response").

The statute also contains three exclusions, added by the Freedom of Information Reform Act of 1986.  *See* Pub. L. No. 99-570, §§ 1801–04, 100 Stat. 3207 (1986).  While the exemptions require the government to balance the privacy interests in nondisclosure against the public interest in disclosure before documents can be withheld, *see Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999), and the agency must reveal the fact of and grounds for any withholdings, the exclusions permit the government to treat requests for records as falling outside the scope of the statute altogether, *see* Department of Justice Guide to Freedom of Information Act ("FOIA Guide"), 2004 Edition: Exclusions (May 2004), *available at* http://www.justice.gov/oip/foia_guide09.htm (last visited Jan. 30, 2012).  "In other words, an agency applying an exclusion will respond to the request as if the excluded records did not exist."  *Tanks v. Huff*, No. Civ. 95-568, 1996 WL 293531, at *5 (D.D.C. 1996), citing the Attorney General's Memorandum on the 1986 Amendments to the Freedom of Information Act ("Atty. Gen.'s Mem.") at 18 (Dec. 1987). The plaintiffs allege that this has happened in this case; consistent with the notion of an exclusion, the FBI is not saying.

### B.  The Section 552(c)(2) Exclusion

The exclusion set forth in 5 U.S.C. § 552(c)(2) is designed to protect against the use of

FOIA requests to law enforcement agencies as a means to uncover the identities of confidential

informants.  The provision states:

> Whenever informant records maintained by a criminal law enforcement agency
> under an informant's name or personal identifier are requested by a third party
> according to the informant's name or personal identifier, the agency may treat the
> records as not subject to the requirements of [FOIA] unless the informant's status
> as an informant has been officially confirmed.

5 U.S.C. § 552(c)(2).

As the Department of Justice explains in its guidance, "[t]his exclusion contemplates the

situation in which a sophisticated requester could try to identify an informant by forcing a law

enforcement agency into a position in which it otherwise would have no lawful choice but to

tellingly invoke Exemption 7(D) in response to a request which encompasses informant records

maintained on a named person."  FOIA Guide at 4.  Although Exemption 7(D) typically allows

an agency to withhold information to prevent the identification of confidential sources, invoking

the exemption in response to a request seeking files on a named individual would confirm that

the suspected individual is indeed a confidential informant.  *Id.* at 4–5.  "[T]his disclosure could

result in devastating harms to the source and to the system of confidentiality existing between

sources and criminal law enforcement agencies."  *Id.* at 4.

To address this situation, the (c)(2) exclusion allows the government to inform the

requester that it has no records responsive to the FOIA request without having to reveal whether

or not there is a file or the named individual is actually an informant.  *Id.* at 4; *see also* S. REP.

NO. 98-221 at 25 (1983) (noting that where the (c)(2) exemption applies, the agency would have

"no obligation to acknowledge the existence of such records in response to the request").  By its

own terms, the (c)(2) exclusion becomes inapplicable if and when an individual's status as an informant "has been officially confirmed."  5 U.S.C. § 552(c)(2); *see also* FOIA Guide at 4.

### C.  The Scope of the Exclusion

Plaintiffs have invited the Court to opine broadly about the scope of the exclusion.  They contend that the (c)(2) exclusion is not available to the FBI here because it applies only to a narrow set of circumstances involving living individuals, cooperating in narcotics or organized crime investigations, where an agency's compliance with a FOIA request could endanger the integrity of an investigation or the safety of an informant.  Pls.' Mot. to Compel at 5–10.  They claim that the exclusion does not apply to the FOIA requests at issue in this case because the alleged confidential informant is deceased, and there is no ongoing criminal investigation into the civil rights movement.  *Id.*

Plaintiffs rely on various statements from the legislative history of the (c)(2) exclusion to support their argument.  *Id.* at 5–7 (citing, for example, statement of Sen. Orrin Hatch that "[t]his section will directly improve drug enforcement" and statement of Sen. Dan Quayle that "the intent of this provision was to prevent targets of organized crime investigations from using the disclosure provisions of FOIA to find out if they were under investigation . . . ") (internal citations omitted).  But under general principles of statutory construction, the Court need not look to legislative history "when a statute's language is plain on its face."  *Pub. Citizen, Inc. v. Rubber Mfrs. Ass'n*, 533 F.3d 810, 818 (D.C. Cir. 2008), quoting *Saadeh v. Farouki*, 107 F.3d 52, 57 (D.C. Cir. 1997).  If a statute's text is plain and unambiguous, "the sole function of the court is to enforce it according to its terms."  *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (internal citations omitted).  Here, the (c)(2) exclusion as written does not contain

any of the limitations that plaintiffs ask the Court to read into the statute.  Rather, it applies "whenever" informant records are requested in a certain manner.  5 U.S.C. § 552(c)(2).

Plaintiffs suggest that while the (c)(2) exclusion may not be ambiguous standing alone, it is ambiguous when read in conjunction with the entire statutory scheme.  *Chemehuevi Tribe of Indians v. Fed. Power Comm'n*, 420 U.S. 395, 403 (1975) (stating that a statutory provision must be "read together with the rest of the Act"); *PDK Labs., Inc. v. Drug Enforcement Admin.*, 362 F.3d 786, 797 (D.C. Cir. 2004) (finding that where there is ambiguity in the statutory scheme, a court should construe the entire statute together).  In particular, plaintiffs contend that two provisions of the FOIA statute – the (c)(2) exclusion and Exemption 7(D) – conflict with each other regarding the treatment of informant records:  the former treats the records as completely outside the scope of the statute, while the latter requires the government to justify any withholdings of information and balance them against the competing public interest in disclosure. Tr. at 5–6.  Given both the two-pronged approach built into the statutory scheme and the legislative history, plaintiffs argue that the Court should construe the exclusion narrowly and apply it only to requests implicating legitimate criminal investigations with ongoing privacy concerns.  Tr. at 5–7, citing *Pickard v. DOJ*, 653 F.3d 782, 788 (9th Cir. 2011).

Plaintiffs point to opinions from the D.C. Circuit and other courts in this district and cite them as authority for the proposition that the exclusion should be limited to these narrow circumstances.  Pls.' Mot. to Compel at 9–10, citing *Benavides v. Drug Enforcement Admin.*, 968 F.2d 1243, 1248 (D.C. Cir. 1992), *modified*, 976 F.2d 751 (D.C. Cir. 1992); *Tanks*, 1996 WL 293531, at *5–6.  But plaintiffs overstate the significance of these cases.  In *Benavides*, the court quoted the jointly prepared comments of the chair and ranking minority member of the House subcommittee involved in negotiating the amendments:  "It is a narrow and specific statutory

authority for criminal law enforcement agencies to act on the principle that an agency may refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under a FOIA exemption." *Benavides*, 968 F.2d at 1247, quoting *Gardels*, 689 F.2d at 1103 (internal citations omitted).   But the issue before the court at that time was the meaning of the phrase "not subject to the requirements of this section," and the statement drawing on the legislative history was simply provided as background.   *See id.* at 1246.   The court did not hold that the exclusion could only be applied in cases involving ongoing drug and organized crime investigations.   *See* Pls.' Mot. to Compel at 9.   And in *Tanks*, while the Court did include language in its opinion indicating that the (c)(2) exclusion was meant to cover only those narrow situations,[3] that discussion was not necessary to the Court's ruling since the status of the individuals as informants had been confirmed, and the FBI was not invoking the exclusion. *Tanks*, 1996 WL 293531, at *5–6.

Plaintiffs also argue that the FBI's position that the (c)(2) exclusion applies in this case is inconsistent with other cases where questions concerning access to records related to confidential informants were resolved based entirely on Exemption 7(D), not the (c)(2) exclusion, even when the documents had been requested under an alleged informant's name.   Pls.' Mot. to Compel at 10, citing *Boyd v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 05-1096, 2006

---

3        Citing the Atty. Gen's Mem., the Court noted: "The (c)(2) exclusion applies to situations involving the threatened identification of confidential informants. *Id.* at 22.   This exclusion is designed to protect against the possible use of the FOIA to discover the identities of confidential informants. *Id.* at 23.   It is reserved for circumstances in which a confidential source is compelled by the criminal organization with which he is associated to surrender his privacy interests, usually either by providing a privacy waiver to the organization or to make the request directly on behalf of the organization. *Id.* at 23–24.   In either case, a law enforcement agency would be in the untenable position of having to respond to a valid FOIA request directly targeted at a named informant's files. *Id.* at 23.   The (c)(2) exclusion is principally intended to permit an agency to avoid giving a response that would identify a named party as a source. *Id.* at 23–24." *Tanks*, 1996 WL 293531, at *6.

WL 2844912 (D.D.C. Sept. 29, 2006); *Campbell v. DOJ*, 231 F. Supp. 2d 1 (D.D.C. 2002); *Burke v. DOJ*, No. 96-1739, 1999 WL 1032814 (D.D.C. 1999). But the (c)(2) exclusion is not mandatory – it says the government "may" treat the documents as not covered by FOIA, not that they are required to do so. 5 U.S.C. § 552(c)(2). Therefore, the fact that the exclusion was not invoked in other cases is not dispositive in this case.

Ultimately, the Court does not need to reach the question of whether the (c)(2) exclusion should be interpreted to be as limited as plaintiffs and the *Tanks* opinion suggest. Because even if the plain language of the exclusion is applied without the proposed narrowing, the exclusion would have no relevance if "the informant's status as an informant has been officially confirmed." 5 U.S.C. § 552(c)(2).

### D.  Judicial Review of an Agency Decision to Invoke an Exclusion

The FBI also invited the Court to address broad issues that may not be necessary to the ruling in this case:  through the time of the hearing, the agency advanced the argument that the plain language of the (c)(2) exclusion affords the agency broad discretion to treat informant records as outside the scope of the FOIA statute, and that this exercise of discretion is not subject to judicial review. Tr. at 27–28 (emphasizing that the statutory language states that "the agency *may* treat the records as not subject to the requirements of [FOIA]") (emphasis added). But in a pleading filed after the hearing, the FBI changed course and stated that an agency's reliance on a FOIA exclusion is subject to some judicial review and should be evaluated under a *de novo* standard. Def.'s Post-Arg. Mem. at 1, citing *Int'l Counsel Bureau v. CIA*, 774 F. Supp. 2d 262, 266 (D.D.C. 2011).

Plaintiffs counter that they have not asked the Court to review an exercise of agency discretion, but rather to determine whether the FBI's reliance on the (c)(2) exclusion in this case

would have been invalid as a matter of law because the informant's status has been confirmed. Pls.' Post-Arg. Mem. at 5.  The Court agrees that it does not need to reach the question of whether an agency's decision to exclude an informant file from FOIA processing is subject to judicial review, or what standard of review would apply, if it determines that official confirmation has occurred in this case and the exclusion is therefore inapplicable.

### E.  Official Confirmation of the Informant's Status

"Where an informant's status has been officially confirmed, a Glomar response is unavailable, and the agency must acknowledge the existence of any responsive records it holds." *Boyd v. Criminal Div. of DOJ*, 475 F.3d 381, 389 (D.C. Cir. 2007).

#### 1.  What Constitutes Official Confirmation?

There is no precedent binding on this Court that sets out a test for what would constitute "official confirmation" for purposes of the exclusion, *see North v. DOJ*, 658 F. Supp. 2d 163, 171 n.7 (D.D.C. 2009), *vacated*, No. 08-1439, 2011 WL 4071634 (D.D.C. Sept. 13, 2011), and neither party was inclined to craft one at the hearing.  Both parties noted the availability of a three-part test for "official acknowledgement" under Exemptions 1 and 3 set forth by the D.C. Circuit in *Wolf*, 473 F.3d at 378, but there is a question as to whether that test should be applied here.  *See Pickard*, 653 F.3d at 789 (declining to apply the *Wolf* "official acknowledgement" test to the (c)(2) exclusion context because the exemptions and the exclusion "do not implicate the same concerns") (concurring opinion).  Under the *Wolf* test, official acknowledgement requires the following elements: (1) "the information requested must be as specific as the information previously released"; (2) "the information requested must match the information previously disclosed"; and (3) "the information requested must already have been made public through an official and documented disclosure[.]"  *Wolf*, 473 F.3d at 378.  And in the *Wolf* case, the Court of

Appeals determined that congressional testimony by the CIA director constituted the official acknowledgment. *Id.* at 379.

There are some instructive cases from this Circuit that have addressed what would <u>not</u> amount to official acknowledgment for purposes of certain FOIA exemptions. *See Ashfar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983) (a leak cannot constitute official acknowledgement); *Valfells, v. CIA*, 717 F. Supp. 2d 110, 118 (D.C. Cir. 2010) (disclosure by another agency and logical deductions made by the requester do not constitute official acknowledgement). And, at least one court has addressed what <u>can</u> constitute official confirmation. *See Pickard*, 653 F.3d at 787 (statements made by U.S. attorneys and testimony solicited by them in open court about a confidential informant was found to be official confirmation).

2.  <u>The Record Reveals that Withers' Informant Status Has Been Officially Confirmed</u>.

Drawing from all of these precedents, the Court finds that Ernest Withers' status as a confidential informant has been officially confirmed. The documents that supply that information were not leaked or disclosed by some other agency or a rogue employee – they were transmitted to the plaintiffs by the Chief of the Record/Information Dissemination Section, Records Management Division, as part of the FBI's own responses to the FOIA request. *See* Argall Decl. ¶¶ 8, 12, 22; Ex. D, Ex. H, and Ex. R to Def.'s Mot. Summ. J; Ex. A and Ex. C to Pls.' Mot. to Compel.[4] A FOIA response is an "official" communication by an agency, made by personnel authorized to make such a disclosure. *See Valfells*, 717 F. Supp. 2d at 118 (suggesting, but not holding, that responses to FOIA requests are "official to some degree").

---

4       If the *Wolf* test were to be applied, all three prongs would be satisfied.

And if the inclusion of the records in a FOIA response alone leaves some room to doubt the conclusiveness of the confirmation, the FBI disclosed the documents a second time in this case by attaching them as exhibits to its motion for summary judgment on the public docket. *See* [Dkt. # 14]. The filing provided even more detail than the first disclosure since notes were added to the original records explaining that the redactions from the document were made pursuant to Exemption 7(D), the category that applies to confidential source information. *See* Ex. X to Argall Decl.

But the FBI persists in its position that the informant's status has not been confirmed. First, it claims that the terms in the records that were released – "Ernest Withers, CI," "ME 338-R" and "Conf. Info." – do not signify that Withers was a confidential informant. Def.'s Opp. to Pls.' Mot. to Compel ("Def.'s Opp.") at 14–16. This argument is not worthy of serious consideration and it insults the common sense of anyone who reads the documents, especially now that the FBI has cited Exemption 7(D) as the justification for the partial redactions. The FBI also asserts that Withers' daughter has informed reporters that the documents do not convince *her* that her father served as an informant. *Id.* at 15–16. The Court is not persuaded that an interested family member's perspective, however sincere it may be, sheds much light on the issue.

The FBI contends that there was no official confirmation in this case because plaintiffs can point to no official public pronouncement revealing Withers' status as a confidential informant. Def.'s Opp. at 13–18. There certainly was no press conference or public ceremony: as the FBI has emphasized, the agency maintains a strict policy against *ever* confirming or denying the identities of confidential sources. *Id.*; Tr. at 32. But the statute, which the FBI contends must be strictly construed, expressly contemplates that there will be circumstances

where official confirmation has occurred.  If the FBI is claiming that confirmation has not been provided by the FBI here because such confirmation is never provided, then it is taking the position that the exception expressly included in the statute is never going to be available.  In a recent case, the Ninth Circuit rejected a similar argument made by the government – that official confirmation can only occur through a press release – noting that no confidential informant had ever been confirmed in that manner, and it was "difficult to believe that Congress intended section 552(c)(2) to be effectively inoperative."  *See Pickard*, 653 F.3d at 788 (concurring opinion) (internal citations omitted).

Finally, the FBI argues that official confirmation must be intentional and not inadvertent. Def.'s Opp. at 16–17; Tr. at 35.  It cites the *Pickard* case, 653 F.3d at 787–88, where deliberately elicited testimony at a public criminal trial was deemed to be official confirmation, and contends that even an official release of information under FOIA cannot be treated as "official confirmation" under the (c)(2) exclusion unless unmasking the confidential informant was the intended result.  Def.'s Opp. at 16.  The FBI submits that to the extent any information suggesting Withers was an informant was disclosed, "it was the product of error [and] no employee in the FBI was authorized" to confirm that information.  Def.'s Post-Arg. Mem. at 4. According to the agency, there was no intent to confirm the alleged informant's status, and the necessary intent cannot be presumed from a FOIA response.  *Id*; Tr. at 38. ("A FOIA processor has authority to release the documents . . . [but] does not have authority to officially confirm a source's identity.").

Plaintiffs' position is that even if the confirming records were disclosed in error, that does not rule out the conclusion that they constitute "official confirmation" under (c)(2).  Pls.' Post-

Arg. Mem. at 5–6.  As plaintiffs put it, "inadvertent" is not the same thing as "unofficial." *See* Tr. at 19.

The Court notes that the FBI can point to no statutory language that calls for a showing of intent before confirmation can be "official" or that requires a planned or purposeful revelation. Congress simply utilized the passive voice and provided that the exclusion would no longer be available if the informant's status "has been officially confirmed."  *See* 5 U.S.C. § 552(c)(2). And plaintiffs' point of view is consistent with the dictionary definition of the term:  the word confirmation simply means that a fact has been established, not that it was formally or purposefully announced.  *See* Oxford English Dictionary online, http://www.oed.com/viewdictionaryentry/Entry/38847 (last visited Jan. 30, 2012) (defining "confirm" as "to corroborate, or add support to (a statement, etc.); to make certain, verify, put beyond doubt"); and Merriam Webster online dictionary, http://www.merriam-webster.com/dictionary/confirm (last visited Jan. 30, 2012) (defining "confirm" as "to give new assurance of the validity of:  remove doubt about by authoritative act or indisputable fact"). Applying these definitions, the documents – which were "officially" disclosed by the FBI – serve to corroborate, verify, and add new assurance to the validity of the assertion that Mr. Withers functioned as a confidential informant for the FBI.

### 3.   The Claim of Inadvertence Does Not Alter the Result.

But even if the Court were inclined to agree with the general principle being advanced by the FBI here that "official confirmation" must be purposeful and not negligent or accidental, that principle would not change the result in this case.  The FBI claims that the confirming disclosure in this case was inadvertent, and that therefore, it should not trigger any consequences under the statute.  *See* Def.'s Post-Arg. Mem. at 4.  The Court notes first that a finding that an informant's

status has been confirmed does not necessarily mean that the government will be required to disclose the documents; it has not yet been determined whether some information in the file may be properly protected under a valid FOIA exemption.  FOIA Guide at 4; *see also Benavides*, 968 F.3d at 1248 ("There is no evidence that Congress intended [the (c)(2) exclusion] to repeal or supersede the other enumerated FOIA exemptions, or to *require*  disclosure whenever the informant's status has been officially confirmed.").   A ruling finding the exclusion to be unavailable simply calls upon the agency to go ahead and process the informant file under FOIA, and identify any material it seeks to withhold pursuant to the statutory exemptions.

But more important, the claim of inadvertence being advanced here is a day late and a dollar short.  It was first raised well after the disclosures, and it is entirely conclusory.  In finding the claim of inadvertence to be unavailing here, the Court notes the following:

- Plaintiffs' FOIA requests were of a high profile nature, and they involved matters of great public interest.

- If the (c)(2) exclusion was involved, the agency's handling of request required the highest level of care.  *See* FOIA Guide at 5 ("When an agency reaches the judgment that it is necessary to employ an exclusion, it should do so as a specific official determination that is reviewed carefully by appropriate supervisory agency officials.  The particular records covered by an exclusion action should be concretely and carefully identified and segregated from any responsive records that are to be processed according to ordinary procedures.") (footnotes omitted).

- Withers was the sole subject of the FOIA request, and the productions of documents made to plaintiffs were not large, so the agency had ample opportunity to review its production carefully.

- One of the documents that confirmed Withers' status as a confidential informant, Ex. B to Pls.' Mot. to Compel, was redacted in part, suggesting that someone looked at it closely and took the time to redact other sensitive information.  The other document, Ex. D to Pls.' Mot. to Compel, has a handwritten notation: "Conf. Info."

- After the documents were released, neither the Department of Justice nor the FBI took any of the remedial steps that ordinarily follow an inadvertent disclosure. The FBI was placed on notice of the disclosure, at the very latest, on May 22, 2009, when plaintiffs explicitly referred to the documents in amending his appeal, but no one even said "oops." The FBI did not immediately send a communication asserting that the disclosure had been accidental, and it did not demand or even request that the documents be sequestered or returned. *Cf. Williams v. District of Columbi*a, No. 06-02076, 2011 WL 3659308 (D.D.C. Aug. 17, 2011) (holding that in the attorney-client privilege context, inadvertent disclosures do not waive privilege when the holder of the privilege promptly took reasonable steps to rectify the error); *see also Bowles v. Nat'l Ass'n. of Home Builders*, 224 F.R.D. 246, 253–54 (D.D.C. 2004) ("Courts have consistently held that, in cases of involuntary disclosure, waiver occurs only when the holder has failed to take reasonable steps to reclaim the protected material.") (internal quotation marks and citations omitted).

- Not only did the FBI fail to take any steps to retrieve the documents, it produced them a second time as attachments to a publicly filed motion for summary judgment. [Dkt. # 14].

In sum, the case does not give rise to concerns that the Court is equating "official confirmation" to a mistake.

The conclusion that the FBI should be bound by the confirmation in this case is bolstered by other circumstances. The Department of Justice has clear rules about what an agency should do when it invokes the (c)(2) exclusion that the FBI did not follow in this case. *See, e.g.*, FOIA Guide at 5–7 (instructing agencies invoking an exclusion that "it is the government's standard litigation policy . . . that, whenever a FOIA plaintiff raises a distinct claim regarding the suspected use of an exclusion, the government will routinely submit an *in camera* declaration addressing that claim, one way or the other"). According to the Department of Justice's own instructions, because the "narrow" situations where the exclusion applies are so serious and fraught with danger for the informant, the agency should not invoke the exclusion publicly. To do so would undermine the whole purpose of the exclusion, which is to enable the government to avoid confirming the existence of a confidential informant by citing Exemption 7 in a FOIA

21

response.  Atty. Gen's Mem. at 16.  Thus, internal Department of Justice guidance states that the government should make an *ex parte* filing with the Court if the (c)(2) exclusion is even implicated.

Yet here, the FBI did no such thing.  Instead, it responded to plaintiffs' motion for summary judgment with an opposition on the public docket expressly citing the (c)(2) exclusion.  In other words, this is yet another example of official, public action by the FBI that tends to verify the informant's status and undermine the FBI's claim that merely complying with the FOIA regime and acknowledging the existence of the records or invoking Exemption 7(D) would cause some harm that the exemptions were designed to prevent.

Finally, if the FBI did invoke the exclusion, it was done under less than compelling circumstances:  not to protect a living informant, but only the deceased informant's descendants; not to protect them from danger or bodily harm, but only from potential stigma or embarrassment, some of which has already come to pass as a result of previous media articles on the subject; and not to avoid revealing the informant's participation in an ongoing, legitimate criminal investigation that could be compromised, but simply to withhold information related to an unfortunate episode in our nation's history from which lessons can be learned.

In its final plea to the Court, the FBI has expressed concern that a determination that Withers' informant status has been confirmed would have a chilling effect on the activities and cooperation of other sources.  Def.'s Post-Arg. Mem. at 3.  This opinion is not meant to and does not establish a general principle that inadvertent disclosure will always constitute official confirmation.  Rather, the Court's ruling turns upon the unique circumstances presented by this case:  first and foremost, a belated and tepid claim of inadvertent disclosure that was not followed by any of the usual conduct that accompanies an inadvertent disclosure; second, the

fact that the informant is deceased; third, the serious questions surrounding the legitimacy of the investigation in which confidential informants were utilized, *see generally,* Senate Select Comm. to Study Governmental Operations with respect to Intelligence Activities, Final Report, Book III, "Dr. Martin Luther King, Jr., Case Study," S. REP. NO. 94-755 (1976); and finally, the substantial amount of time that has elapsed since the investigation and the informant relationship were active, *see In re Kutler,* 800 F. Supp. 2d 42, 50 (D.D.C. 2011) ("The special circumstances presented here – namely, undisputed historical interest in the requested records – far outweigh the need to maintain the secrecy of the records.")  Given the entirely *sui generis* nature of the case and the fact that it is not meant to set any precedent that would apply to ongoing and/or legitimate organized crime, narcotics, or even white collar criminal investigations, the Court is confident that the ruling will not have the chilling effect feared by the FBI.

As a final point of clarification, the Court does not hold that the informant file must be produced – only that if the FBI has relied on the (c)(2) exclusion to treat the records as outside the scope of FOIA, that exclusion is no longer available in this case.  So the FBI must review the file if it exists and then either produce the responsive documents or provide a Vaughn index identifying the specific exemptions under which any responsive documents have been withheld. *See Benavides*, 968 F.2d at 1246 ("[W]e conclude that when an informant's status *has been* officially confirmed, the requirements of FOIA govern, and the agency must acknowledge the existence of any records it holds.").  Thus, the motions for summary judgment will be denied as moot without prejudice to the filing of additional motions in the future if a dispute remains after the FOIA review has been undertaken and completed.  If the FBI asserts Exemption 7 as its justification for the withholding of documents, the Court will take up the question of whether the threshold for its application has been met at that time.  *See Roth v. DOJ*, 642 F.3d 1161, 1173

(D.C. Cir. 2011), citing *Pratt v. Webster*, 673 F.2d 408, 419–21 (D.C. Cir. 1983).  And whether the Court will need to call for *in camera* review of the file will depend on the nature and extent of any claimed exemptions, so any order to compel such production is premature.

## CONCLUSION

Because the Court finds that Withers' status as a confidential informant has been officially confirmed, it will grant plaintiffs' motion to compel production of a Vaughn index [Dkt. # 18].  The cross motions for summary judgment [Dkt. # 9 and # 14] and the motion to compel the production of the records for *in camera* review will be denied as moot without prejudice.  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  January 31, 2012

FD-36 (Rev. 7-27-76)

FBI

TRANSMIT VIA:
☐ Teletype
☐ Facsimile
☐ Airtel

PRECEDENCE:
☐ Immediate
☐ Priority
☐ Routine

CLASSIFICATION:
☐ TOP SECRET
☐ SECRET
☐ CONFIDENTIAL
☐ E F T O
☐ CLEAR

Date _____

---

PAGE 2  (ME 194-16)  E F T O

OF THE HOBBS ACT - CORRUPTION OF PUBLIC OFFICIALS.  AUSA CLANCY

ALSO APPROVED RECORDING A TELEPHONE CONVERSATION BETWEEN

[          ] AND WITHERS.

ON SEPT. 13, 1977 [        ] GAVE HER WRITTEN PERMISSION

TO HAVE THE TELEPHONE CONVERSATION RECORDED.  SHE SUBSEQUENTLY

CALLED WITHERS AT HIS BUSINESS NUMBER AND RECORDED A CONVERSATION

LASTING APPROXIMATELY 20 MINUTES.  DURING THIS CONVERSATION,

WITHERS REITERATED HIS PROMISE TO HAVE [     ] MOVED TO A WORK

RELEASE CENTER FOR $2,000.  HE ALSO INDICATED HE FELT CERTAIN

THAT [     ] COULD BE RELEASED AFTER HE HAD "ACQUIRED THE PROPER

BACKGROUND."  WITHERS WOULD NOT TELL [        ] EXACTLY HOW MUCH

IT WOULD COST TO GET [     ] OUT OF PRISON BUT INDICATED IT WOULD

BE AT LEAST $12,000 TO $16,000.

[          ] WORKING WITH MEMPHIS OFFICE IN ATTEMPTING TO

ARRANGE A MEETING WITH WITHERS TO COMPLETE THE NEGOTIATIONS

FOR WITHERS' TRIP TO NASHVILLE.

ERNEST COLUMBUS WITHERS WAS FORMERLY DESIGNATED AS

ME 338-R, [                                    ]

CAPTIONED "ERNEST COLUMBUS WITHERS; CI."  THESE CASES WERE

---

Approved: _____   Transmitted _____   Per _____
                                          (Number)    (Time)
                                                              GPO 1977 O - 325-539

Exhibit 1

4-22 (Rev. 12-22-76)

FEDERAL BUREAU OF INVESTIGATION
Records Branch

_____, 19_____

☐ Name Searching Unit, 4543 JEH-FBI Bldg.
☐ Service Unit, 4654 JEH-FBI Bldg.
☐ Forward to File Review
☐ Attention
☐ Return to

Supervisor ___ Room ___ Ext. ___

**Type of Search Requested:**
☐ Restricted Search Not Applied
☐ All Reference (Subversive & Nonsubversive)
☐ Subversive Search       DEC 11 1918
☐ Nonsubversive Search
☐ Main _____ References Only

**Special Instructions:**
☐ Restricted to Locality of _____
☐ Exact Name Only (On the Nose)
☐ Buildup          ☐ Variations

Subject   Witberg   Ernest   C.
Birthdate & Place _____
Address _____

Localities _____

R# ___9___          12/7          Searcher
Prod. ___          Date          Initials

| FILE NUMBER | SERIAL |
|---|---|
| 157 - 6-28-704   p5 | |
| 157 - 6-28-822 | |
| Ernest Columbus (bu) | |
| E 27 N. 44 | |
| 1914-141   27N. 47 | |
| 194-45   27N.3 | |
| 44-32471 E   7/12/63 | |
| 157-6-28-113 | |
| 157-6-28-155.1370 | |
| 157-6-28-408.2 ; 538/1 | |
| 157-896-153 ; 168 encl p10 | |
| Ernest | |
| 62-101087-45-170 ✓ | |
| 100-442245-6 p3 ✓ | |
| | |
| Conf-info. | |

FBI/DOJ

EXHIBIT 2